Filed 10/8/25  In re Gabriel W. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re GABRIEL W., a Person Coming Under the Juvenile Court Law. | B340528 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NICOLE A.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 23CCJP02896B) |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee.  Reversed with directions.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Nicole A. appeals from the juvenile court's order terminating her family reunification services under Welfare and Institutions Code section 366.21[1] regarding her son Gabriel W. Nicole argues that the Los Angeles County Department of Children and Family Services failed to provide reasonable family reunification services and that the Department and the court failed to consider a maternal aunt for preferential relative placement under section 361.3. Nicole also argues the Department failed to conduct a proper inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.

We conclude the juvenile court erred in several respects. First, the court failed to find at the six-month and 12-month review hearings whether the Department offered Nicole reasonable reunification services, as required by section 366.21, subdivisions (e) and (f). The minute orders (presumably prepared by the clerk) state the court made those findings, but the court did not make them. To the extent the court made such implied

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

findings, substantial evidence did not support them. Second, the court failed to determine whether the Department made an adequate inquiry regarding Gabriel's possible status as an Indian child, as required by ICWA and related California law. The court, however, did not fail to consider placing Gregory with a relative under section 361.3: There was no evidence that anyone requested a change in Gabriel's placement or that a qualifying relative was available for placement. Therefore, we reverse the order terminating Nicole's reunification services and direct the juvenile court to order the Department to provide Nicole additional reunification services. We also direct the juvenile court to make findings whether the Department conducted an adequate inquiry under ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Juvenile Court Declares Gabriel a Dependent Child of the Court and Removes Him from Nicole*

In July 2023 the Department received a referral stating Nicole was neglecting Gabriel's brother Carl W. Jr. (born in 2005, therefore now an adult, and not involved in this appeal). The referring party stated that Nicole told Carl that he could no longer live at home and that, when Nicole heard Carl planned to stay with a family friend, Nicole told the friend not to take Carl in because "she wants him on the streets." During the initial investigation the case social worker learned that the family (which included the boys' father, Carl Sr.) was about to be evicted from their home and that Nicole feared they would be homeless. Nicole said that Gabriel (born in 2013) had been staying with the maternal grandmother temporarily, but that he could not stay

3

there very long because the grandmother lived in a senior community that did not allow long-term guests.

The social worker interviewed Nicole, both boys, and the maternal grandmother in August 2023. Nicole said Carl Sr. had just completed a five-month rehabilitation program for alcohol abuse. (The social worker observed Carl Sr. was "passed out" on the floor in the home and then struggled to walk around the apartment. She and Nicole agreed Carl Sr. appeared to be intoxicated.) Gabriel said that both Nicole and Carl Sr. "needed help," that Nicole "has a mental health problem" and "breaks down a lot," and that Nicole yelled frequently at Carl Sr. and the boys. He also said that Carl Sr. had "a problem with alcohol," but that he felt safer with Carl Sr. than with Nicole "because of her mood and mental health." Gabriel also said that Nicole would disappear for days at a time, leaving them in Carl Sr.'s care, and that he had not attended school since February or March 2023. The maternal grandmother said Nicole was diagnosed with bipolar disorder as a teenager, was involuntarily hospitalized several times, and had attempted suicide. She also said that Nicole had a history of methamphetamine use and that she suspected Nicole was "drinking or using drugs again due to her behavior," which the maternal grandmother described as "erratic" and "irrational."

In late August 2023 the Department requested, and the court issued, an emergency detention order. The court ordered monitored visitation for Nicole. The Department placed Carl with a family friend, Heather P., and placed Gabriel with a foster family.

In supplemental interviews described in the Department's jurisdiction and disposition report, Carl Sr. said Nicole had been

using methamphetamine since September 2022. Nicole denied using methamphetamine, admitted using marijuana, and declined to take a drug test without a court order. Regarding visitation, Nicole visited with Gabriel once, and the visit went well. The Department tried to schedule additional visits, but encountered two challenges. First, though Gabriel's foster family initially agreed to monitor Nicole's visits with Gabriel, the family declined to continue monitoring visits after Nicole "started canceling and/or failing to show up for family time." Second, Nicole stopped responding to the social worker. Though the Department approved Heather P. to monitor Nicole's visits with Gabriel, the social worker could not reach Nicole to confirm a visitation schedule. Nicole contacted Gabriel by phone approximately twice a week.

In a last minute information report for the court, the Department said that Nicole visited Gabriel a second time in late October 2023 and that the visit went well. The Department, however, was looking for a new monitor because Heather P. could not monitor visits every week. Gabriel's foster family declined to monitor Gabriel's telephone calls with Nicole after she "began calling the caregivers at all hours of the day including at 5:00 a.m. In addition, she began sending multiple text messages to them and also including them in group text messages with [Department] staff and unknown individuals where she was ranting and accusing [the Department] of kidnapping her child." The Department advised the court it was "highly concerned about mother's mental health and mental/emotional stability or lack thereof and the impact this continues to have on the children and their respective caregivers. There is concern that mother's behavior is jeopardizing the children's, specifically child,

Gabriel's placement." The Department subsequently learned Nicole had been arrested in late October 2023 for assault with a deadly weapon and attempted carjacking.

On November 29, 2023 the juvenile court sustained a petition under section 300, subdivision (b). The court found true allegations the boys had suffered, or there was a substantial risk they will suffer, serious physical harm or illness because (1) Carl Sr. had a history of substance abuse and was a current abuser of alcohol, which rendered him unable to adequately supervise or regularly care for the children; (2) Nicole had a history of substance abuse, including methamphetamine, and was a current abuser of marijuana and alcohol, which rendered her unable to adequately supervise or regularly care for the children; and (3) Nicole had mental and emotional problems (including erratic and violent behavior toward the children), had been diagnosed with bipolar disorder, had attempted suicide and suffered two prior involuntary hospitalizations, and failed to take psychotropic medications as prescribed, which rendered her unable to regularly care for the children.

The juvenile court declared Gabriel a dependent child of the court, removed him from both parents, and ordered family reunification services. Nicole's case plan included weekly drug testing (and a six-month drug and alcohol program if she tested positive or missed a test without excuse); individual counseling and courses to address case issues, including anger management, parenting, substance abuse, and the effect of family violence and drug abuse on children; and mental health counseling, including psychiatric evaluations and medications as prescribed. The court ordered monitored visitation for Nicole and gave the Department discretion to liberalize visitation. The court also ordered the

Department to provide Nicole with transportation and housing assistance.

B. *Nicole Does Not Substantially Comply with Her Case Plan, and the Juvenile Court Continues Family Reunification Services*

In July 2024 the court held a six-month review hearing under section 366.21, subdivision (e). Prior to the hearing the Department was largely unable to verify Nicole's compliance with her case plan because Nicole had not signed a release form authorizing the Department to obtain information from her medical providers. Nicole told the Department social worker that she was participating in individual therapy, mental health counseling, and a parenting class. Nicole did not enroll in a 26-week anger management class. Nicole appeared for drug testing on December 27, 2023 and tested negative, but otherwise Nicole did not comply with the court's order for weekly drug testing. Though the court had ordered the Department to return to court if Nicole missed any drug tests without a valid excuse, the Department did not do so. (That may have been because the court uploaded an incorrect case plan after the disposition hearing. More on that later.) The Department also reported that as of March 2024 Nicole was homeless and living in Riverside County. The Department, however, did not arrange for Nicole to drug test in Riverside County until September 2024 and never provided transportation assistance there.

The court found that Nicole had not substantially complied with her case plan and that returning Gabriel to her would create a substantial risk of detriment to his safety and well-being. The

court ordered the Department to provide additional family reunification services.

C.  *Nicole (Still) Does Not Substantially Comply with Her Case Plan, and the Juvenile Court Terminates Family Reunification Services*

For the next review hearing the Department reported Nicole had complied with some aspects of her case plan. Nicole completed a parenting class, but still had not enrolled in an anger management class. Nicole was under the care of a psychiatrist (and had been since April 2021), but missed several medication-management appointments with her doctor. Nicole was still homeless and residing in Riverside County for most of the period of supervision.

Nicole began drug testing a month before the scheduled review hearing. She tested negative once, missed one test, and tested positive for amphetamine and methamphetamine twice. Nicole denied using drugs and maintained one of her prescription medications caused the (false, according to her) positive test results. The Department was unable to ascertain whether Nicole's theory was viable. The Department recommended terminating Nicole's reunification services and continuing-monitored visitation.

At the 12-month review hearing in October 2024 the juvenile court found returning Gabriel to Nicole would create a substantial risk of detriment because Nicole had recently tested positive for methamphetamine. The court terminated Nicole's family reunification services. Nicole filed timely notices of appeal from the court's orders at the six-month and 12-month review hearings. We consolidated the two appeals.

8

# DISCUSSION

Nicole challenges the order terminating her reunification services on three grounds: The juvenile court erred in finding at the six-month and 12-month review hearings the Department provided her with reasonable services, the Department and the juvenile court failed to apply the relative placement preference in sections 309 and 361.3, and the court erred in finding the Department conducted an adequate inquiry under ICWA and related California law. We conclude that Nicole's first and third arguments have merit and that the juvenile court erred in several respects that require reversing the order terminating her reunification services.

A. *The Juvenile Court Did Not Find the Department Provided Reasonable Reunification Services, and Substantial Evidence Did Not Support an Implied Finding*

1. *Applicable Law and Standard of Review*

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family. [Citations.] Such services may, depending on the case, include evaluations and assessments, counseling, parent education, substance abuse treatment and testing, and other forms of assistance." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624, fn. omitted; accord, *In re A.O.* (2025) 111 Cal.App.5th 1048, 1059; see *In re M.S.* (2019) 41 Cal.App.5th 568, 590 ["In a juvenile dependency proceeding, a parent generally has a statutory right

9

to reunification services when his or her child is removed from the parent's custody at a disposition hearing."], disapproved on another ground in *Michael G.*, at p. 631, fn. 8; see also §§ 361.5, subd. (a), 362, subds. (c), (d).)

At both the six-month review hearing and the 12-month permanency hearing the juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  (§ 366.21, subds. (e)(1), (f)(1).)  In addition, "[i]f the child is not returned to their parent or legal guardian, the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent or legal guardian . . . ."  (§ 366.21, subds. (e)(8), (f)(1)(A).)  "Although the statute does not define 'reasonable services,' the Courts of Appeal have generally held that, to support a finding that services were reasonable, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .'"  (*Michael G. v. Superior Court*, *supra*, 14 Cal.5th at p. 625, fn. 6; see *In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)

"'When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence.'

10

[Citation.] 'In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' [Citation.] 'The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case.'" (*In re A.O.*, *supra*, 111 Cal.App.5th at pp. 1061-1062.)

> ## 2. *The Juvenile Court Did Not Find the Department Provided Reasonable Reunification Services at the Six-month and 12-month Review Hearings*

As discussed, at the six-month and 12-month review hearings the juvenile court had to determine by clear and convincing evidence whether the Department provided reasonable reunification services designed to address the problems that led to Gabriel's removal from Nicole. (§ 366.21, subds. (e)(8), (f)(1)(A).) The court, however, made no such finding.

The court did not find at the contested six-month review hearing, by clear and convincing evidence or otherwise, the Department provided reasonable services. The court began the hearing like this: "This is a contested [hearing under section 366.21, subdivision] (e). This is mother's contest. The court has read and considered the [Department's] report, as well as today's last minute [report] reflecting that reunification services have been provided to mother. She continues to be in

11

meager compliance with the case plan." The court received two exhibits into evidence, and counsel for Nicole made a brief argument relating to the case plan. The court ruled: "The court has read and considered the documents. Mother continues to be in partial compliance with the case plan. There is a likelihood in the next period she will reunite. We'll continue the matter over to August 28, that's the date of the [hearing under section 366.21, subdivision] (f), the 12-month date. And mother is ordered back on that date. The Department has discretion to liberalize mother's visits; otherwise, all prior orders to remain." Nothing about reasonable services or their provision. The court did refer at the outset of the hearing to the "last minute [report] reflecting that reunification services have been provided to mother," but that was not really a finding, by clear and convincing evidence, the Department provided reasonable services designed to address the issues that led to Gabriel's removal. When the court made that statement at the beginning of the hearing, the court was only summarizing the material it had "read and considered." The court never stated it was making a reasonable-services finding based on that material.

At the contested 12-month permanency hearing the juvenile court again did not find the Department provided reasonable reunification services. The court summarized the materials it had reviewed and invited counsel to argue. Counsel for Nicole argued the Department had not provided reasonable services during the period of supervision and asked the court to continue reunification services for an additional six months. The court's ruling was brief: "Well, I, too, would like to reunite this child with his parents, but mother has made it impossible for me to do that. As late as less than a month ago, September 25,

12

mother tested positive for methamphetamine. On September 17 she tested positive for methamphetamine. . . . We're 14 months in this case and mother is still testing positive. I cannot make the appropriate findings for mother." After granting Carl Sr.'s request for additional reunification services, the court stated, "I'm finding there is no likelihood that she will reunite and I'm terminating her services today." The court did not rule the Department had provided reasonable reunification services. And that omission is particularly glaring because counsel for Nicole argued the services the Department had provided were neither adequate nor reasonable under the circumstances.

The minute orders from the six-month and 12-month review hearings do not mention "reasonable services." The closest they come is the statement: "The Court finds that the Department of Children and Family Services has complied with the case plan by making reasonable efforts to return the child to a safe home and to complete any steps necessary to finalize the permanent placement of the child." It is unclear whether this statement was intended to be the required finding, by clear and convincing evidence, the Department provided reasonable services designed to address the problems that led to Gabriel's removal. But if it was, the minute orders include findings the juvenile court did not make. We again ask the court (or the clerk) to cease the practice of entering orders not made at the hearing. (See *In re R.O.* (2022) 83 Cal.App.5th 586, 594 ["[T]he courtroom clerk embellished the trial judge's oral ruling with actions the judge did not take. This practice is wrong. Courtroom clerks must faithfully reflect in the minutes what actually happened *and nothing more.*"] (conc. opn. of Robie, J.); *In re T.G.* (2020) 58 Cal.App.5th 275, 298, fn. 20 [discouraging the practice of

13

entering "minute orders that include findings that were not made or, on occasion, are in direct conflict with the statements as reported in the hearing transcripts"].)

> 3.   *Substantial Evidence Did Not Support an Implied Finding the Department Provided Reasonable Reunification Services*

In the absence of express findings by the juvenile court, we may imply a finding the Department provided reasonable reunification services.  (See *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1166 ["Where the statute does not mandate explicit findings, and where substantial evidence supports the juvenile court's order, findings may be implied."]; see, e.g., *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 ["sufficient evidence supports the trial court's implicit finding that the department provided reasonable reunification services"].)  But we cannot do that here.

Assuming the court determined at the six-month and 12-month review hearings the Department provided reasonable services because the Department complied with the court's case plan, as the Department suggests, substantial evidence did not support such findings.  Regarding the first period of supervision (before the six-month review hearing), the written case plan the court issued at disposition was admittedly incorrect.  As stated, in November 2023 the court ordered Nicole to drug test on a weekly basis and ordered the Department to return to the court if Nicole missed a test or tested positive for any substances, so that the court could order Nicole to a drug rehabilitation program.  But the case plan signed by the court—which the Department used to develop its referrals—stated Nicole needed to

14

immediately enroll in a full-drug and alcohol-rehabilitation program and a 12-step program with a sponsor.

It is true Nicole did not comply with the court's order to drug test on a weekly basis during the first six-month period of supervision. But the record suggests the Department's referrals did not match the services prescribed by the (correct) case plan during that time. In the Department's report for the six-month review hearing the social worker said she gave Nicole a copy of the court's (incorrect) case plan, a resource guide, and a drug testing referral in December 2023. But the report also said the social worker did not learn until May 16, 2024 the court had not ordered Nicole to complete a full drug rehabilitation program. Counsel for Nicole advised the court on May 29, 2024 the Department social worker "didn't have the proper case plan so she was not on the proper drug testing sites." When the court asked if Nicole was in a drug program, her attorney explained "she was never ordered to do a drug program, Your Honor. The case plan was incorrect, that's why the reports are all incorrect. You ordered testing and there [were] issues with testing." Nicole raised the issue with the social worker on May 30, 2024 and said "per your consistent errors please fix the drug screening paperwork and send me a signed case plan and orders from a judicial officer before I can comply with this information. I have yet to hear any judge order anything of me nor been given any paperwork or evidence to support that what you are giving me now is accurate and correct." Nicole added: "Please for the love of God send me these corrected orders signed by a judicial officer and have the drug screening paperwork corrected . . . ." Counsel for Nicole raised the issue again at the six-month review hearing and said "that was the issue in the beginning with why the social

15

worker was not providing mother with the proper referrals because she had the wrong case plan." The court did not enter a corrected case plan until July 17, 2024. Thus, Nicole's failure to drug test before July 2024 may have been, at least in part, due to an error by the court and misdirected referrals by the Department.

Nicole also had difficulty drug testing due to housing and transportation instability—areas in which the court ordered the Department to provide services. The Department's efforts fell short. Nicole was evicted from her home in early March 2024. As a result, from March 2024 to September 2024 Nicole frequently moved between temporary housing she found outside of Los Angeles County. Though Nicole lived temporarily in Riverside County beginning in May 2024 and did not have a working car, the Department did not refer Nicole to a drug testing site in Riverside County until September 2024. And the Department did not attempt to provide Nicole with transportation assistance outside of Los Angeles County until late September 2024. Again, Nicole's failure to comply with the court's drug testing order may have been due in part to the Department's failure to provide services tailored to her circumstances. In any event, Nicole never received the services the court said it was ordering: a six month drug and alcohol rehabilitation program.

It is also true that the Department made significant efforts to facilitate Nicole's visitation with Gabriel, that the social worker spent a substantial amount of time responding to Nicole's voluminous written communications, and that Nicole was often reluctant to cooperate with Department social workers. But the court's erroneous case plan guided the family reunification services the Department provided during the first six-month

period of supervision, and the Department failed to provide transportation assistance and drug testing opportunities in Riverside County, where Nicole found temporary shelter during the second period of supervision.  Substantial evidence did not support implied findings the Department provided reasonable services during the six-month and 12-month review periods.

B.    *Neither the Court nor the Department Ignored the Relative Placement Preference*

Nicole argues the court and the Department "failed to comply with sections 309 and 361.3 with respect to the mother's request to assess maternal aunt for preferential relative placement of Gabriel."  There is no evidence, however, anyone asked the court or the Department to place Gabriel with the maternal aunt or any relative covered by the statutes.

"At the outset of a dependency case, section 361.3, subdivision (a), requires [the child protective agency] and the court to give 'preferential consideration' to a relative's request for placement, which means 'the relative seeking placement shall be the first placement to be considered and investigated.'  [Citation.] The reason for preferential consideration requires little explanation.  The trauma of removing a child from their home, and all that is familiar, can be eased by placement with beloved and recognizable relatives who can provide needed comfort." (*Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 490.) Section 309 includes a similar requirement regarding temporary placement of a child following an emergency detention.  (§ 309, subd. (d).)

Nicole argues she "requested for the maternal aunt to be evaluated for placement early in the case" and complains the

17

juvenile court "committed errors of law in completely ignoring sections 309 and 361.3 relative placement preference in selecting foster placement for Gabriel, without regard to mother's request for placement assessment with the maternal aunt." Although Nicole does not identify the maternal aunt by name in her briefs, she appears to mean Gabriella C. At the 12-month review hearing (which Nicole cites) counsel for Nicole stated: "Mother has also offered relative placement options. She has a sister. Her name is Gabriella C., . . . who has a place and is willing and able to have the child placed with her, yet the Department— I think just this week—had spoken to her for the first time." As best we can tell from the Department's (redacted) delivered-services log, Nicole gave the social worker Gabriella's name and phone number for the first time on September 9, 2024 "for placement emergency reasons."

As a preliminary matter, it is unclear whether the relative placement preference under section 361.2 applies to Gabriella. "'Relative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship, including stepparents, stepsiblings, and all relatives whose status is preceded by the words 'great,' 'great-great,' or 'grand,' or the spouse of any of these persons, even if the marriage was terminated by death or dissolution." (§ 361.3, subd. (c)(2).) The Department social worker contacted Gabriella by phone and identified Gabriella as Nicole's stepsister, not Nicole's sister. The definition of "relative" for purposes of section 361.3 does not include Gabriella's relationship to Gabriel (maternal stepaunt?).

Moreover, though Nicole argues she repeatedly asked the Department to assess the maternal aunt for placement, she cites nothing in the record to show she made such a request. Nicole

18

suggested placement options, but not with Gabriella. For example, Nicole filled out a relative-information sheet in August 2023 and listed her great-grandmother Dalores A. and family friend Rose C.; she did not list Gabriella. There is no evidence Nicole told the Department about Gabriella before September 9, 2024.

In any event, there is no evidence either Nicole or Gabriella asked the Department or the court to place Gabriel with Gabriella. And when the social worker spoke to Gabriella a few weeks before the 12-month review hearing, Gabriella said she was not ready to care for Gabriel. She stated: "'Yes, I am willing to take Gabriel in. Nicole and I have been discussing this for some time. However, I only have a one-bedroom apartment, and I am in the process of upgrading to a two-bedroom.'" The social worker obtained Gabriella's email address and sent her a resource family application, but there is no other information in the record. And as stated, counsel for Nicole mentioned Gabriella at the 12-month hearing, but she did not ask the court to change Gabriel's placement.

### C. *The Juvenile Court Must Determine Whether the Department Conducted an Adequate Further Inquiry Under ICWA and Related California Law*

Finally, Nicole argues "the juvenile court and the Department failed to comply with the inquiry and notice requirements of the ICWA and related California law." Nicole is correct.

19

1.      *Applicable Law and Standard of Review*

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1128; accord, *In re Ja.O.* (2025) 18 Cal.5th 271, 277; *In re C.R.* (2025)112 Cal.App.5th 793, 799.)  "[W]hether ICWA applies in dependency proceedings turns on whether the minor is an Indian child." (*Dezi C.*, at p. 1129; see *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1098 ["The protective provisions of ICWA turn on a determination of whether a minor is an 'Indian child' as defined by statute."].)  ICWA and California law define an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (b).)

"Agencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child." (*In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1132; see § 224.2, subd. (a); *In re Ja.O.*, *supra*, 18 Cal.5th at p. 277.)  "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re C.R.*, *supra*, 112 Cal.App.5th at p. 799; see *In re D.F.* (2020) 55 Cal.App.5th 558, 566.)  The Department's duty to inquire begins with the initial contact "including, but not limited to, asking the party

20

reporting child abuse or neglect whether the party has any information that the child may be an Indian child, and upon a county department's first contact with the child or the child's family, including extended family members . . . ." (§ 224.2, subd. (b)(1); see *Dezi C.*, at p. 1132; Cal. Rules of Court, rule 5.481(a)(1).)[2]

When the court or child protective agency has reason to believe an Indian child is involved, the law requires further inquiry regarding the possible Indian status of the child. (§ 224.2, subd. (e)(2); see Cal. Rules of Court, rule 5.481(a)(4).) Further inquiry includes interviewing the parents and extended family members, contacting the Bureau of Indian Affairs and

---

[2] Effective September 27, 2024, the Legislature amended section 224.2 to clarify the juvenile court's role. "For a court presiding over any juvenile proceeding that could result in placement of an Indian child with someone other than a parent or Indian custodian, including proceedings where the parents or Indian custodian have voluntarily consented to placement of the child, the duty to inquire begins at the first hearing on a petition. At the commencement of the hearing, the court shall ask each party to the proceeding and all other interested persons present whether the child is, or may be, an Indian child, whether they know or have reason to know that the child is an Indian child, and where the child, the parents, or Indian custodian are domiciled, as defined in Section 224.1. Inquiry shall also be made at the first appearance in court of each party or interested person who was not present at the first hearing on the petition. The inquiry and responses shall occur on the record. The court shall instruct the parties and persons present to inform the court if they subsequently receive information that provides reason to know the child is, or may be, an Indian child." (§ 224.2, subd. (c).) This provision was in effect for the 12-month review hearing.

State Department of Social Services, and contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility for membership in a tribe.  (§ 224.2, subd. (e)(2)(A)-(C); see Cal. Rules of Court, rule 5.481(a)(4).)  At this stage, contact with a tribe "shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of [ICWA] notices" and "sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case."  (§ 224.2, subd. (e)(2)(C); see *In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1132-1133.)

The juvenile court must then determine whether there is reason to know the child is an Indian child and whether ICWA applies to the proceedings.  If the facts discovered during the initial and further inquiry give the court "reason to know that the child is an Indian child, the court shall treat the child as an Indian child," unless and until further information establishes the child is not an Indian child, and shall order compliance with ICWA, including formal notice to relevant tribes.  (§ 224.2, subd. (i)(1); Cal. Rules of Court, rule 5.481(b)(3)(B).)  If, on the other hand, "the court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings . . . ."  (§ 224.2, subd. (i)(2); accord, Cal. Rules of Court, rule 5.481(b)(3)(A); see *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1134 [juvenile court may find ICWA does not apply if it finds the agency's "inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know

the child is an Indian child"]; *In re C.R.*, *supra*, 112 Cal.App.5th at p. 800 [same].)  The "juvenile court errs in making a finding ICWA does not apply to the proceedings without first ensuring that the Department has made an adequate inquiry under ICWA and California law, and if necessary, the court must continue the proceedings and order the Department to fulfill its responsibilities." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 431.)

### 2. *Additional Facts Regarding the Department's Investigation*

In its section 300 petition the Department indicated the social worker asked Nicole and Carl Sr. about Indian ancestry and that, based on her inquiry, she had "reason to believe the child [Gabriel] is or may be an Indian child" because his "parents, grandparents, or great-grandparents are or were members of a tribe."  The parents identified "Yaqui, Sioux, [and] Suri" as the possible tribes.

The detention report stated ICWA "does or may apply." During interviews with the social worker, Nicole said that "her family was Yaqui, Suri, and Sioux Indian," that "the maternal great grandfather Gabriel A. is Yaqui and Suri," and that "the maternal great grandmother Geraldine V. is Sioux."  The social worker interviewed Carl Sr. and the maternal grandmother Susan V., both of whom denied Indian ancestry.

Both parents completed ICWA-020 forms.  Carl Sr. denied Indian ancestry.  Nicole said she was a member of, or might be eligible for membership in, a federally recognized tribe because one or more of her parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe.  She

23

identified the tribes as the "Suri and Yakee Apachee" tribes in Arizona.

At the initial hearing on August 29, 2023 the court asked counsel for Nicole if she had any additional information regarding her family's tribal affiliation. Counsel said that Nicole's mother might have additional relevant information and that Nicole's father had died. The court directed the Department to interview the maternal grandmother to get more information and subsequently found "it's not an Indian case, as to mother, as I have no reason to know."

The jurisdiction and disposition report contained no new information regarding the Department's ICWA inquiry. On November 29, 2023 the juvenile court held the jurisdiction and disposition hearing. Counsel for Nicole told the court that the Department social worker interviewed the maternal grandmother and that, though the maternal grandmother initially denied any Indian ancestry, "she's reporting Dakota, maybe that's Lakota. I'm not sure." The court directed the Department to submit a progress report to "address the [Department's] efforts in investigating whether ICWA applies or does not apply in this case" and set a progress hearing for February 28, 2024.

In a February 27, 2024 last minute information report the Department summarized its further ICWA investigation. Nicole referred the social worker to her uncle, Randy A. He said that "'my great, great, great grandfather married a Seri Indian, but it is such a little amount of Indian within the family,'" and that "'my father was part of Boys Scout organization Choctaw Indian.'" The maternal grandmother told the social worker, "'my maternal grandmother and [her] twin were found in a basket by grandma G. who adopted them in 1800's in South Dakota, but

don't know the tribe.'" Carl Sr., who initially denied any Indian ancestry, told the social worker that his paternal grandmother had Indian ancestry. The Department interviewed her and she said she had "'always been told Cherokee and Blackfoot Indian, but never had any proof.'" The Department social worker told the court that she was "currently investigating all of the Indian tribes of affiliation that . . . each individual reported." The court did not address ICWA at the (extremely brief) progress hearing on February 28, 2024.

In the Department's report for the six-month review hearing the social worker said that on February 29, 2024 she "sent first class mail to 54 Indian tribes." The report listed the tribes, their points of contact, and their mailing addresses. The report did not specify the information the social worker provided to the tribes, and there is no copy of the correspondence in the record. The social worker said that 33 tribes responded to the Department and that each tribe determined Gabriel was neither registered with nor eligible for enrollment in the tribe. The report attached copies of certified mail receipts and the response letters from the tribes.[3] The court did not address ICWA at the six-month review hearing.

The Department's report for the 12-month review hearing repeated the information in the report for the six-month review

---

[3] The record does not include a copy of the notice. The record does include one of the response letters, which attached a copy of the first page of a form notice (ICWA-030) the Department apparently sent to the tribe. The court did not find it had reason to know Gabriel is an Indian child, nor did the court order the Department to provide formal notice of the proceedings to any tribes.

hearing regarding its ICWA investigation.  During the intervening period of supervision, one additional tribe responded to the Department's inquiry and that tribe, like the others, determined Gabriel was not registered with, or eligible for membership in, the tribe.  The court did not address ICWA at the 12-month review hearing.

### 3. *The Court Failed To Comply with Its Duties Under ICWA and Related California Law*

Nicole argues the Department did not conduct an adequate inquiry and failed to provide adequate notice to the tribes it identified.  She also argues the juvenile court erred in "finding that the Department made reasonable efforts to gather familial history from available relatives, and that . . . ICWA did not apply to Gabriel, because the Department did not report the linear information on its ICWA-030 Notice to the tribes, as apparent from the response letters received."  Though Nicole is wrong about what the court did, she is correct the court erred.

As discussed, at the outset of the proceedings the Department had reason to believe Gabriel was an Indian child because Nicole (and later Carl Sr.) claimed Indian ancestry.  The court ordered, and the Department conducted, a further inquiry. So far, so good.  The problem is that the court did not decide whether it had reason to know Gabriel was an Indian child *after* the Department conducted its further inquiry.  The court was required to "review . . . the evidence of due diligence, further inquiry, and tribal contacts" and determine whether "the agency or other party has fulfilled its duty of due diligence, further inquiry, and tribal contacts . . . ."  (Cal. Rules of Court, rule 5.481(b)(3).)  If the court found the Department's

investigation was adequate, the court had to decide whether it had reason to know Gabriel was an Indian child.  (*Ibid*.)  The court did not make any of those findings.

True, each of the tribes that responded to the Department said Gabriel was not enrolled or eligible for membership in the tribe—evidence that could support a finding there is no reason to know Gabriel is an Indian child.  But Nicole argues the Department's inquiry was insufficient because, according to Nicole, the social worker did not provide the tribes with all the relevant information she obtained from the family members she interviewed.  That argument goes too far.  We do not know what information the Department sent to the tribes.  The Department's reports do not say what information the social worker shared with the tribes, and the record does not include copies of the Department's correspondence with the tribes.  And because the juvenile court failed to review or evaluate the Department's investigatory efforts, the court never learned what information the Department relayed to the tribes.  The Department might have done everything right.  But on this record, there is insufficient evidence from which the court could have (expressly or impliedly) found the Department fulfilled its duty of further inquiry under ICWA and related California law.

**DISPOSITION**

The July 17, 2024 and October 9, 2024 findings the Department provided reasonable reunification services to Nicole during the relevant periods of supervision are reversed. The juvenile court is directed to order a minimum of six months of additional reunification services for Nicole and to make findings, on the record, whether the Department conducted an adequate inquiry under ICWA and related California law.

SEGAL, J.

We concur:

MARTINEZ, P. J.

FEUER, J.